UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Mark and Linda Lessard,
        Plaintiffs

        v.                                    Civil No. 05-cv-192-SM
                                              Opinion No. 2007 DNH 057
Wilton-Lyndeborough Cooperative
School District and The State of
New Hampshire Dept. of Education,
        Defendants

## O R D E R

Plaintiffs, Mark and Linda Lessard, appeal an administrative decision issued by the New Hampshire Department of Education on March 22, 2005, upholding the appropriateness of the 2004-05 individualized education program ("IEP") prepared for their daughter, S.L.  They assert that the IEP failed to provide S.L. with a free appropriate public education, as mandated by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.  They also claim that the administrative hearing itself was so fundamentally flawed and unfair that they were deprived of due process.  See Plaintiffs' Decision Memorandum (document no. 95) at 2.  They seek both a judicial declaration that S.L.'s IEP for the 2004-05 school year at Crotched Mountain Rehabilitation Center was not appropriate and an order awarding her compensatory educational services.

Defendants, the Wilton–Lyndeborough Cooperative School District (the "School District") and the New Hampshire Department of Education, assert that S.L.'s IEP was entirely adequate to provide her with an appropriate education.  Defendants also deny that there were any procedural irregularities associated with the due process hearing that were serious enough to call into question the validity of S.L.'s IEP.

For the reasons set forth below, plaintiffs' requests for relief are denied and the decision of the hearings officer dated March 21, 2005 is affirmed.

## Legal Framework

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A). Under the scheme established by the IDEA, and in return for federal funding, state educational agencies establish procedures to identify and evaluate disabled students in need of special education services.  See 20 U.S.C. § 1412.  For each identified child, a team comprised of the child's parents, teachers, and a

2

representative of the educational agency develops an
individualized education plan ("IEP") for the child.

An IEP consists of "a written statement for each child with
a disability that is developed, reviewed, and revised in
accordance with section 1414(d) of [the IDEA]."  20 U.S.C. §
1401(11).  It must be "reasonably calculated to enable the child
to receive educational benefits," Bd. of Educ. v. Rowley, 458
U.S. 176, 207 (1982), and "custom tailored to address the
[disabled] child's 'unique needs,'" Lenn v. Portland Sch. Comm.,
998 F.2d 1083, 1086 (1st Cir. 1993) (citing 20 U.S.C. § 1400(c)).

Importantly, however, neither the IDEA nor New Hampshire law
requires the IEP to "maximize" a child's educational benefits.
See, e.g., Lenn, 998 F.2d at 1086 (holding that federal law does
not require that "the benefit conferred [by the IEP] reach the
highest attainable level or even the level needed to maximize the
child's potential.").  Instead, the IDEA establishes more modest
goals and imposes on states and local school districts an
obligation to provide a program that is "sufficient to confer
some educational benefit upon the handicapped child." Rowley,
458 U.S. at 200.  Accordingly, "the 'basic floor of opportunity'
provided by the Act consists of access to specialized instruction

3

and related services which are individually designed to provide educational benefit to the handicapped child." Id. at 201.

If a parent believes that a proposed IEP will not provide an appropriate education, or that the procedures established by the IDEA have not been properly followed in developing the IEP, he or she may request an administrative due process hearing to review the matter. See 20 U.S.C. § 1415(f). If a parent or the affected school district is dissatisfied with the administrative hearing officer's ruling, that party may seek judicial review in either state or federal court. 20 U.S.C. § 1415(i)(2).

## Factual Background

To say that substantial time, effort, and resources have been dedicated to developing S.L.'s 2004-05 IEP would be an understatement. The administrative record in this case includes more than 3,100 pages, in nine volumes – the index alone is 35 pages long. There is also a volume of supplemental material submitted by defendants that spans several hundred additional pages. The Lessards were permitted to supplement the administrative record with additional materials, including live testimony from Mrs. Lessard and the deposition testimony of Dr. Robert Kemper.

4

Over the course of several years, during which the Lessards and the School District have attempted to formulate various IEPs for S.L., the parties' relationship has deteriorated. As a consequence, Mrs. Lessard claims the School District advised S.L.'s teachers not to speak directly with Mrs. Lessard without a district administrator present. Plaintiffs' Statement of Disputed Facts (document no. 67) at para. 10. In turn, Mrs. Lessard has filed numerous complaints against the School District, on various topics, with the New Hampshire Department of Education, the U.S. Department of Education's Civil Rights Division (as well as its Office of Inspector General), the New Hampshire Governor, the United States Secretary of Education, the State's Commission on Disability, and several United States Senators and Representatives. Id. at para. 33. No doubt, both the School District and Mrs. Lessard share a measure of responsibility for the parties' working relationship. And, needless to say, that relationship made efforts to formulate S.L.'s 2004-05 IEP difficult.

When the process of developing S.L.'s IEP for the 2004-05 academic year began, she was 18 years old and a student at Crotched Mountain Rehabilitation Center, a private residential and day school that provides educational and therapeutic services

to students with developmental and physical disabilities.  S.L.
is severely disabled and suffers from moderate mental retardation
(her I.Q. is 42), scoliosis, left hemiparesis, leg length
discrepancy, a seizure disorder, cognitive delays, speech
impairments, and orthopedic impairments.  Plaintiffs' Statement
of Disputed Facts at para. 5.  She has been coded as multiply
handicapped, speech/language impaired, mentally retarded, and
orthopedically impaired.  Plaintiffs do not challenge her
placement at Crotched Mountain.  They do, however, challenge her
IEP, claiming it was inadequate to provide her with the federally
mandated minimum educational benefits.

Beginning in 2002, the School District paid for the
following evaluations for S.L.: an adaptive equipment evaluation
by NH-ATEC; a sensory processing evaluation by Angel Care
Occupational Therapy; a range of motion evaluation by
occupational therapist Abby LaRock; a functional behavioral
assessment by the May Institute; and a vocational assessment by
Easter Seals.  In addition, plaintiffs obtained a
psycholinguistic evaluation by Dr. Robert Kemper.  All of the
information yielded by those evaluations was available to the
team when it began formulating the 2004-05 IEP.

Between April and December of 2004, S.L.'s IEP team convened
at least seven times (normally, for between two and three hours),
in an effort to produce an IEP that was appropriate for S.L. and
acceptable to the Lessards.  Affidavit of Janet Folger at para.
70, Admin. Rec., Vol. 6, pg. 1836.  The final version of the
2004-05 IEP offered by the School District to the Lessards (dated
8/16/04 and covering the period from 9/7/04 through 7/1/2005)
contains nearly 60 pages describing educational planning,
academic goals, and transition training (as well as a proposed
behavioral management plan, discussed below).  It is, by far, the
most detailed and comprehensive IEP the court has seen.

When, after many hours of team meetings and negotiations,
the IEP team was unable to agree upon an IEP that was
satisfactory to Mrs. Lessard, the School District asked
plaintiffs to specifically identify the portions of the proposed
IEP with which they disagreed and to outline any proposed
additions, deletions, or modifications they wanted.  Plaintiffs
failed (or refused) to do so – something Mrs. Lessard was unable
to explain at the hearing before this court on December 1, 2006.
Nevertheless, as she had with the prior year's IEP, Mrs. Lessard
flatly refused to accept what the School District had proposed.

Because the School District was unable to determine
precisely which aspects of the IEP Mrs. Lessard found
unacceptable, it concluded that the process might be facilitated
if plaintiffs had the benefit of legal counsel.  Accordingly, the
School District offered to pay for plaintiffs' legal
representation in mediation.  That offer was, however,
conditioned on plaintiffs identifying those specific portions of
the IEP with which they disagreed.  Again, however, plaintiffs
failed to do so.

The complete chronology of the various team meetings is
succinctly summarized in the affidavit of Janet Folger, the
Special Education Director for the School District and a member
of S.L.'s IEP team.  Admin Rec., Vol. 6, pages 1832–1839.  It is
also set forth, in somewhat greater detail and with numerous
record citations, in Defendants' List of Disputed Facts (document
no. 66).  Plaintiffs' statement of disputed facts also includes a
chronology of events, though it is less helpful than defendants'
because, rather than citing to the administrative record for
support, it tends to cite almost exclusively to Mrs. Lessard's
affidavit.

Eventually, after it became clear that the parties were at
an impasse, the School District sought a due process hearing.
That hearing took place over two days, during which both Mrs.
Lessard and the School District presented witnesses.  Although
she was repeatedly afforded the opportunity to testify, Mrs.
Lessard affirmatively declined.  On March 21, 2005, the hearings
officer issued his decision, in which he concluded that the
"[School] District's offered IEP . . . is found to be reasonable
and appropriate to enable Student to make reasonable and
appropriate educational progress during the 2004–05 school year.
The [School] District is the prevailing party."  Admin Rec.,
Supp. Vol., pg. 3136 (attached to document no. 47).  This appeal
followed.

In their three count complaint, plaintiffs assert that the
state educational hearings officer who presided over the due
process hearing deprived them of rights guaranteed by the IDEA
(counts one and two), and also failed to reasonably accommodate
Mrs. Lessard's claimed disability, as required by the Americans
with Disabilities Act (count three).  At a hearing before the
court during which plaintiffs were permitted to supplement the
administrative record, however, plaintiffs clarified their
claims.  When questioned by the court, plaintiffs expressly

stated that they did not intend count three of their complaint to
serve as a free-standing claim under the ADA.  Instead, they
asserted that it is simply a claim that the educational due
process hearing was not fair because the hearings officer failed
to reasonably accommodate Mrs. Lessard's claimed disabilities.
See Transcript of hearing (Dec. 1, 2007) at 2-5.  In other words,
rather than advancing a claim under the ADA, count three of
plaintiffs' complaint simply reasserts their view that the
administrative hearing was flawed and, as a result, they were
deprived of their due process rights.

     As noted above, plaintiffs seek a judicial declaration that
S.L.'s IEP for the 2004-05 school year at Crotched Mountain was
not appropriate and an order awarding her compensatory
educational services.  Defendants assert that S.L.'s IEP was
entirely adequate to provide S.L. with an appropriate education,
and they deny that there were any procedural irregularities
associated with the due process hearing sufficiently serious to
call into question the validity of S.L.'s IEP.

### Standard of Review

     The district court's review of state educational
administrative proceedings has been described as "one of involved

oversight." Lenn, 998 F.2d at 1087.  The applicable standard is an intermediate one under which the district court must exercise independent judgment, but, at the same time, afford "due weight" to the administrative proceedings.

> The required perscrutation must, at one and the same time, be thorough yet deferential, recognizing the expertise of the administrative agency, considering the agency's findings carefully and endeavoring to respond to the hearing officer's resolution of each material issue.  Jurists are not trained, practicing educators.  Thus, the statutory scheme binds trial courts to give 'due weight' to the state agency's decision in order to prevent judges from imposing their view of preferable educational methods upon the States.

Roland M., 910 F.2d at 989 (citations and internal punctuation omitted).  See also L.T. v. Warwick Sch. Comm., 361 F.3d 80, 83–84 (1st Cir. 2004).

District court review is focused on two questions: (1) whether the parties complied with the procedural requirements of the IDEA; and (2) whether the IEP developed through those procedures was reasonably calculated to enable the disabled child to receive some educational benefit.  See, e.g., Rowley, 458 U.S. at 206–07.  The burden of proof rests with the party challenging the administrative decision – here, the Lessards.  See Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992);

Roland M., 910 F.2d at 991.  To carry that burden, plaintiffs must do more than simply point to the existence of procedural irregularities.  "Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."  Id. at 994.

Finally, in reviewing the sufficiency of an IEP, courts must remember that they are called upon to review the adequacy of an educational plan at the time it was implemented, rather than with the benefit of hindsight, and, generally speaking, must afford substantial deference to the educational programs developed by educators and other experts.

> [T]he focus of an inquiry under 20 U.S.C. § 1415(e)(2) . . . is not whether the IEP was prescient enough to achieve perfect academic results, but whether it was "reasonably calculated" to provide an "appropriate" education as defined in federal and state law.  This concept has decretory significance in two respects. For one thing, actions of school systems cannot . . . be judged exclusively in hindsight.  An IEP is a snapshot, not a retrospective.  In striving for "appropriateness," an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated.

> For another thing, the alchemy of "reasonable
> calculation" necessarily involves choices among
> educational policies and theories – choices which
> courts, relatively speaking, are poorly equipped to
> make.  Academic standards are matters peculiarly within
> the expertise of the state department of education and
> of local educational authorities.  We think it well
> that courts have exhibited an understandable reluctance
> to overturn a state agency's judgment calls in such
> delicate areas – at least where it can be shown that
> the IEP proposed by the school district is based upon
> an accepted, proven methodology.

Roland M., 910 F.2d at 992 (citations and internal punctuation

omitted).  The scope of this court's review of S.L.'s 2004-05 IEP

is, then, fairly narrowly circumscribed.

> Beyond the broad questions of a student's general
> capabilities and whether an educational plan identifies
> and addresses his or her basic needs, courts should be
> loathe to intrude very far into interstitial details or
> to become embroiled in captious disputes as to the
> precise efficacy of different instructional programs.

Id.

## Discussion

I.   Procedural Challenges.

The Lessards summarize their procedural challenges to the

due process hearing as follows:

> In the end, S.L. and Plaintiffs were unable to be
> represented by counsel, were unfairly foreclosed from
> participating in the prehearing procedures mandated by
> law, were unable to present the testimony of Dr.
> Kemper, were left at a decided disadvantage in the

13

presentation and cross-examination of witnesses owing
to the unfair affidavit procedure established by the
hearing officer, and faced an increasingly hostile
decision-maker who seemed to have his mind made up
throughout the proceedings.

Plaintiffs' Decision Memorandum at 8.  None of those claims is
meritorious.

The Lessards make much of the fact that, pursuant to the
hearings officer's instruction, the School District prepared
affidavits for each of its witnesses, summarizing the testimony
the School District expected them to give.  Mrs. Lessard claims
she was disadvantaged by the fact that she did not receive all of
those affidavits in advance of the hearing and, therefore, was
required to cross-examine some witnesses after only having just
received a copy of the witness's affidavit.

The use of the affidavits (which was discussed at the pre-
hearing meeting) was for the benefit of the hearings officer.
And, having reviewed the administrative record, including a
transcript of the due process hearing itself, the court cannot
conclude that the School District's use of the affidavits
prejudiced plaintiffs or impaired Mrs. Lessard's ability to
participate in the due process hearing or meaningfully question

14

the School District's witnesses.  First, none of the testimony offered by the School District's witnesses should have been surprising to Mrs. Lessard.  The parties had been negotiating the 2004-05 IEP for many months and Mrs. Lessard, of all people, was quite familiar with the School District's position on all aspects of the IEP.  Additionally, when Mrs. Lessard complained about the procedure, the hearings officer offered: (1) to have the witness read the affidavit directly into the record, so Mrs. Lessard could actually hear the testimony; and (2) to afford Mrs. Lessard a brief break during which she could review the affidavit.  Admin. Rec., Vol. 1, pgs. 347-50.  Mrs. Lessard declined.

The Lessards also complain that the hearing officer refused to reschedule the hearing so their expert – Dr. Kemper – might be able to appear and testify.  Dr. Kemper's report was, however, part of the record.  Moreover, when the hearings officers asked Mrs. Lessard to explain how Dr. Kemper's live testimony might augment or clarify his written report, she was unable to provide an answer.  In short, she gave no explanation for why it was necessary to delay the hearing so that Dr. Kemper might provide live testimony.

Plaintiffs have not shown how they were prejudiced or how the due process hearing was undermined by virtue of Dr. Kemper's absence.  Morever, as the hearings officer noted, the literacy programs advocated by both Dr. Kemper and Ms. Siegmann were not substantially different from the literacy program offered by the School District, through Crotched Mountain.  Ultimately, the focus must necessarily be on the educational progress S.L. made (and is likely to make), rather than on the particular methodology employed.  And, as to that point, all of her teachers and school administrators testified that, given her substantial deficits, S.L.'s progress in reading under the program administered by Mr. Tanner was reasonable and appropriate.

Plaintiffs remaining challenges to the due process hearing, including their assertion that the hearings officer was biased, are without merit.  None of the Lessard's procedural challenges to the due process hearing (or the hearing officer himself) are sufficient to suggest that their opportunity to participate in the process of formulating S.L.'s IEP was "seriously hampered," or that S.L.'s right to a free appropriate education was adversely affected in any way.  See generally Roland M., 910 F.2d at 994.  In fact, plaintiffs were afforded broad and substantial

16

input into S.L.'s IEP and, under that IEP, S.L. made appropriate educational progress.

II. <u>The Substance of S.L.'s IEP</u>.

Plaintiffs challenge S.L.'s 2004-05 IEP on three grounds, claiming the program was deficient in the areas of literacy, transition services, and behavior management.  <u>See</u> Plaintiff's Decision Memorandum at 12.  Plaintiffs also claim the School District violated the IDEA by failing to have the 2004-05 IEP in place at the start of S.L.'s school year.  <u>See</u> <u>Id</u>. at 15.

A. <u>Alleged Delay in Presenting an IEP</u>.

According to plaintiffs, "it was not until during the team meeting held on December 2, 2004 . . . that [the School District] first provided Plaintiffs with a completed draft IEP for their consideration."  Plaintiffs' Decision Memorandum at 17.  Plaintiffs go on to assert that: "[t]his delay constituted a most basic violation of the IDEA's well-established procedures and amounted to a violation of S.L.'s right to an appropriate education sufficient to entitle her to compensatory relief."  <u>Id</u>. The court disagrees.

The IEP team began meeting in April and by August of 2004, had completed a proposed IEP – with the exception of a behavior plan (discussed more fully below), which had yet to be approved by Crotched Mountain.  But, understanding that it was important to resolve any outstanding problems plaintiffs might still have with the IEP and get it into place quickly, the School District offered to put that IEP into effect, and secure approval of the behavioral aspects of the plan as soon as possible thereafter. Again, however, although Mrs. Lessard refused to specifically identify what portions of the comprehensive IEP she disagreed with and declined to offer any specific amendments, additions, or deletions she wanted to make, she refused to sign it.

Having carefully reviewed the record, the court cannot escape the conclusion that it was Mrs. Lessard who was responsible for the delay in getting S.L.'s IEP for 2004–05 into place.  As of the meeting held in August of 2004, the School District offered to plaintiffs a comprehensive IEP that met the requirements of the IDEA.  But, as she had done the year before, Mrs. Lessard refused to sign the IEP while, at the same time, declining to identify those portions of it that she thought should be amended.  Based on this record, one might reasonably infer that Mrs. Lessard was more concerned with the <u>process</u> of

18

creating an IEP for S.L. than she was in actually getting an appropriate IEP into place and implementing it.  For example, as late as February of 2005, Mrs. Lessard expressed the view that S.L.'s IEP for 2004-05 was "still in the developing stage" and indicated that she would "like to continue the process with the team."  Admin. Rec., Vol. 5, pg. 1793.

While she is understandably a zealous advocate for S.L., Mrs. Lessard's efforts and energies seemed to be focused on obtaining a "perfect" IEP for S.L. — one that described in intricate and painstaking detail every possible component of S.L.'s educational program, but without having a developed view about what that perfect IEP would look like.  See, e.g., Affidavit of Janet Folger at para. 55, Admin. Rec., Vol. 6, pg. 1835 ("Mrs. Lessard wanted a high degree of specificity in the objective.  For instance, Mrs. Lessard wanted information about when [S.L.] would be brushing her teeth and whether she would be brushing them 'thoroughly.'  She wanted to clarify what kind of hair care would be addressed in the general goal for hair care.").  Not only is such a goal impractical, it is not required by either State or federal law.

Here, although there was some delay in getting S.L.'s comprehensive IEP finalized, nothing in the record suggests that it caused her education to suffer.  Pending implementation of that IEP, her instructors simply continued the program developed in the prior year's IEP, augmenting it as appropriate.  And, in the end, all of her instructors testified that she made demonstrable educational progress during the 2004-05 year.

B.   <u>The Contents of the IEP</u>.

As noted above, plaintiffs challenge three specific areas of the IEP as being deficient: literacy, transition services, and behavior management.  As to the literacy component of S.L.'s education, her parents claim that:

> Given the written report submitted to the School in
> July 2004 and Dr. Kemper's personal appearance and
> explanation of his recommendation at the August 2004
> IEP meeting, [the School District] had everything it
> needed to provide S.L. with an appropriate literacy
> program for the 2004-2005 school year.  It
> inappropriately chose not to do so.  Both the
> incomplete August 2004 IEP draft and the December 2004
> IEP offer contain no reference whatsoever to the daily
> 1:1 LiPS program that Dr. Kemper had recommended as
> essential for providing S.L. with foundational literacy
> skills.

Plaintiffs' Decision Memorandum at 2.  While it is true that the School District (with input from S.L.'s teachers at Crotched

20

Mountain) decided not to incorporate into S.L.'s curriculum the
Lindamood Phoneme Processing System (a/k/a "LiPS" Program)
recommended by Dr. Kemper, that does not compel the conclusion
that her IEP was deficient in the area of literacy.  As the
hearings officer observed, the parties essentially disagreed as
to the proper methodology to employ when instructing S.L.  While
the School District elected not to employ the methodology
requested by the Lessards and recommended by Dr. Langer, the IDEA
does not require school districts to acquiesce in parental
requests of that sort.  See, e.g., G.D. v. Westmoreland Sch.
Dist., 930 F.2d 942, 948 (1st Cir. 1991) ("a FAPE may not be the
only appropriate choice, or the choice of certain selected
experts, or the child's parents' first choice, or even the best
choice.  Barring higher state standards for the handicapped, a
FAPE is simply one which fulfills the minimum federal statutory
requirements.") (emphasis in original).  The focus must
necessarily be on the IEP as implemented and whether it provided
the student with demonstrable educational benefit.  In this case,
the literacy training S.L. received did provide her with
demonstrable educational benefit.

    So it was with the behavior management and transition
services S.L. received.  As for S.L.'s transition plan and

services, the court agrees with the School District's description
of the IEP:

> Not only does S.L.'s IEP include a transition plan
> (Vol. III, 1026-27) and reference courses of study
> throughout (Vol. III, 982, 987, 994, 104-06), but
> S.L.'s instructional design, as envisioned by the IEP,
> encompasses skill development specifically targeting
> prevocational and independent living skills.  The goals
> and objectives for transition services are embedded in
> the IEP.  To that end, [Crotched Mountain] spends a
> minimum of six hours of instructional time per week on
> prevocational skill development.

Defendants' Reply Memorandum (Document no. 97) at 10.  The IEP is
comprehensive and all of S.L.'s teachers who testified at the due
process hearing (both on direct and cross-examination) agreed
that S.L. was making progress in the areas covered by the
transition plan.  While the IEP did not incorporate everything
the Lessards wanted, it did provide S.L. with transitional
educational services far in excess of the minimum standards
imposed by the IDEA.  Again, it is appropriate to remember that
the requirements imposed by the IDEA on school districts are
fairly modest.

> The IDEA does not promise perfect solutions to the
> vexing problems posed by the existence of learning
> disabilities in children and adolescents.  The Act sets
> more modest goals: it emphasizes an appropriate, rather
> than an ideal, education; it requires an adequate,
> rather than an optimal, IEP.  Appropriateness and
> adequacy are terms of moderation.  It follows that,

although an IEP must afford some educational benefit to
the handicapped child, the benefit conferred need not
reach the highest attainable level or even the level
needed to maximize the child's potential.

Lenn, 998 F.2d at 1086.


Finally, the court concludes that the 2004-05 IEP's
provisions relating to S.L.'s behavior plan were more than
adequate.  As the Court of Appeals for the Seventh Circuit has
observed, there are only two circumstances under which a
behavioral intervention plan might be warranted.  See Alex R. v.
Forrestville Valley Comty. Unit Sch. Dist., 375 F.3d 603, 614-16
(7th Cir. 2004).  The first - which is not implicated in this
case - is when the school district imposes certain types of
discipline on the student.  See 20 U.S.C. § 1415(k)(1).  The
second is when the student exhibits behavioral problems that
impede the student's learning or that of other students.  The
relevant section of the IDEA provides that the IEP team shall,
"in the case of a child whose behavior impedes the child's
learning or that of others, consider the use of positive
behavioral interventions and supports, and other strategies, to
address that behavior."  20 U.S.C. § 1414(d)(3)(B)(I) (emphasis
supplied).  And, even when the IDEA requires the IEP team to
consider behavioral intervention, it does not establish any

23

express statutory or regulatory standards governing the content
of such a program.  See Alex R., 375 F.3d at 615 ("In short, the
District's behavioral intervention plan could not have fallen
short of substantive criteria that do not exist, and so we
conclude as a matter of law that it was not substantively invalid
under the IDEA.").

The "behavior program" portion of S.L.'s IEP more than
satisfied the requirements imposed by the IDEA.  That section of
the IEP spans nine pages and includes general guidelines for
addressing S.L.'s behavioral problems, specific "shaping
behaviors" that teachers would employ to assist S.L. in coping
with transitions and completing difficult tasks, a section
devoted to a "reinforcement program" aimed at rewarding positive
behavior, an "independence/supervision program" that outlines
three levels of progress that would be expected of S.L., as well
as a "crisis management" section dedicated to outlining means by
which to address any angry outbursts or times when S.L. became
non-compliant with direction from her teachers and/or school
administrators.  See Admin. Rec., Vol. 3, pgs. 1028-1036.  S.L.'s
behavior program was well in excess of the minimum requirements
imposed by the IDEA.

24

**Conclusion**

Prior to filing this litigation, the Lessards never clearly or fairly communicated to the School District how or why they believed S.L.'s IEP for the 2004-05 school year was deficient – despite numerous pleas from the School District that they do so, and at least two offers from the School District to pay for an attorney to assist them in formulating any proposed modifications to the School District's proposal.  Instead, the Lessards continually refused to agree to the School District's proposed IEP, without offering any substantive proposed changes (other than the LiPS program recommended by Dr. Kemper).

While the court is certainly aware of the enormously difficult situation in which the Lessards find themselves – struggling to educate and provide for a daughter who suffers from severe disabilities – it is decidedly unhelpful to the process when they repeatedly reject serial IEP proposals made by the School District, without offering some hint as to precisely what educational services they feel were improperly tailored to provide S.L. with some educational benefit.  More importantly, however, their refusal/inability to work cooperatively with the School District to formulate and implement an IEP for S.L. in a timely manner disserves S.L.'s interests – particularly given the

25

fact that the services offered by the School District to S.L. (at least during the year in question) were well in excess of the minimum required by the IDEA.

Despite the difficulties encountered during the process of creating an IEP for S.L., the School District formulated and implemented an IEP that took into consideration S.L.'s unique needs and provided her with an appropriate education.  While S.L. may not have reached the level of performance and/or independence that her parents expected, and although the Lessards may have preferred that Crotched Mountain use slightly different teaching techniques (e.g., the "LiPS" Program recommended by Dr. Kemper), the School District was not required to provide special education services designed to maximize S.L.'s potential, or those prescribed by the parents or their experts.  Rather, it was obligated to deliver services that provided some educational benefit to S.L.  See, e.g., G.D. v. Westmoreland Sch. Dist., 930 F.2d at 948.  See also T.B. v. Warwick Sch. Comm., 361 F.3d at 83 ("IDEA does not require a public school to provide what is best for a special needs child, only that it provide an IEP that is reasonably calculated to provide an appropriate education as defined in federal and state law.") (citation and internal punctuation omitted); Walczak v. Florida Union Free Sch. Dist.,

142 F.3d 119, 132 (2d Cir. 1998) ("IDEA does not require states to develop IEPs that maximize the potential of handicapped children.  What the statute guarantees is an 'appropriate' education, not one that provides everything that might be thought desirable by loving parents.") (citations and internal quotation marks omitted).

During the academic year in question, the School District fully met its legal obligations to S.L. and provided her with an IEP that was custom-tailored to her many divergent special needs, and one that afforded her a free appropriate public education. Plaintiffs' procedural challenges to the due process hearing (and surrounding meetings) are insufficiently substantial to call into question the validity of either the IEP itself or the factual findings of the hearing officer.  Nor is there sufficient evidence to suggest that plaintiffs were denied a meaningful opportunity to participate in the formulation of S.L.'s IEP — to the contrary, the School District went more than the extra mile to enlist plaintiffs' participation.

In light of the foregoing, plaintiffs' requests for relief are denied and the decision of the hearings officer dated March

21, 2005, is affirmed.  The Clerk of Court shall enter judgment

in favor of defendants and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

April 23, 2007

cc:  Jennifer A. Eber, Esq.
     Richard L. O'Meara, Esq.
     Jeanne M. Kincaid, Esq.
     Karen A. Schlitzer, Esq.